UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Roberto Dominguez Cisneros,

Petitioner,

v.

Janet Napolitano, Secretary of the
Department of Homeland Security;
Eric Holder, Attorney General of the
United States; Scott Baniecke, Field
Office Director, Immigration and
Customs Enforcement; and Bob
Kindler, Freeborn County Sheriff;

Respondents.

Civ. No. 13-700 (JNE/JJK)

**REPORT AND RECOMMENDATION**

---

Bruce D. Nestor, Esq., De Leon & Nestor, LLC, counsel for Petitioner.

David W. Fuller, Esq., Erika R. Mozangue, Esq., and Gregory G. Brooker, Esq., Assistant United States Attorneys, counsel for Respondents.

---

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

This matter is before the Court on Petitioner Roberto Dominguez Cisneros' Petition for Writ of Habeas Corpus (Doc. No. 1, Pet.), which Petitioner brings under 28 U.S.C. § 2241(c). This case has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons discussed below, this Court recommends that Cisneros' Petition be dismissed.

## BACKGROUND

**I. Facts**

Petitioner is a citizen and national of Mexico. (Doc. No. 8, Decl. of Brett R. Navarro ("Navarro Decl.") ¶ 4.) He has been a lawful permanent resident of the United States since April 6, 1983. (*Id.*) Petitioner has significant ties to the United States. His father is a naturalized citizen of the United States, his mother is a permanent resident of the United States, and he has several siblings who are either citizens of or lawful permanent residents of the United States. (Pet. 1.) He also has a daughter who is a United States citizen. (Pet. ¶ 9.) Until his current detention, Petitioner was gainfully employed between September 25, 2006, and March 4, 2013. (Pet. ¶ 14.)

Petitioner also has a criminal history. On December 9, 2003, Petitioner pleaded guilty to having been involved in a drive-by-shooting incident in which he stepped out of a vehicle he was riding in as a passenger and discharged a firearm at another car. (Doc. No. 9, Decl. of David W. Fuller ("Fuller Decl.") ¶ 2, Attach. 1 at 6–10 (Guilty Plea); *Id.*, Attach. 1 at 12–19 (Criminal Complaint).) On March 15, 2004, Petitioner was convicted of that drive-by-shooting crime in the Rice County Court in Faribault, Minnesota, for the offense of "Dangerous Weapons – Shooting," in violation of Minnesota Statute § 609.66, subd. 1e(a).[1]

---

[1] Minnesota's drive-by-shooting statute provides that "[w]hoever, while in or having just exited from a motor vehicle, recklessly discharges a firearm at or toward another motor vehicle or a building is guilty of a felony and may be
(Footnote Continued on Following Page)

(Pet. ¶ 10; Navarro Decl. ¶ 5.) Petitioner was sentenced to a 48-month term of imprisonment with the Minnesota Department of Corrections. (Pet. ¶ 10; Navarro Decl. ¶ 5; Fuller Decl. ¶ 2, Attach. 1 at 4–5 (Felony Sentencing Order).) Petitioner's sentence was stayed for a period of five years provided that he would serve 365 days in jail and comply with conditions of probation. (Pet. ¶ 10; Fuller Decl. ¶ 2, Attach. 1 at 4 (Felony Sentencing Order).) On December 9, 2004, Petitioner completed his sentence of imprisonment (Pet. ¶ 11), and on April 19, 2007, Rice County Community Corrections discharged Petitioner from probation. (Fuller Decl. ¶ 2, Attach. 1 at 2 (4/19/07 Rice County District Court Order).)

After his release from prison, Petitioner appears to have resided in the United States without incident for more than eight years. However, on February 14, 2013, agents of the Office of the United States Immigration and Customs Enforcement ("ICE") apprehended Petitioner at his residence during an enforcement operation. (Navarro Decl. ¶ 6; Pet. ¶ 15.) An ICE officer served Petitioner with a Notice to Appear at removal proceedings that same day, which alleged that Petitioner was removable, in part, on grounds that he had been convicted of an aggravated felony when he pleaded guilty to the drive-by-

---

(Footnote Continued from Previous Page)
sentenced to imprisonment for not more than three years or to payment of a fine of not more than $6,000, or both." Minn. Stat. § 609.66, subd. 1e(a).

shooting charge in December 2003.[2]  (*See* Fuller Decl. ¶ 3, Attach. 2 at 1–2 (Notice to Appear).)  ICE took Petitioner into custody on February 14, 2013, under the authority of 8 U.S.C. § 1226(c), and determined that Petitioner could not request a review of his custody determination by an immigration judge because the Immigration and Nationality Act prohibits his release.  (Pet. ¶ 22; Fuller Decl. ¶ 4, Attach. 3 (Notice of Custody Determination); *see also* Navarro Decl. ¶¶ 7–8.)  In other words, as explained in more detail below, ICE has determined that Petitioner falls into a category of aliens who have been convicted of certain crimes that makes them ineligible to be released from custody on bond or parole while ICE attempts to deport them.  *See* 8 U.S.C. § 1226(a)(2) (providing that, except in certain circumstances, an alien who has been arrested pending removal proceedings may be released on bond or conditional parole).

After taking Petitioner into custody, Petitioner appeared for a removal hearing on March 12, 2013, and on March 25, 2013, Immigration Judge William J. Nickerson, Jr., issued a Memorandum and Order sustaining the charge that Petitioner is removable because he was convicted of an aggravated felony.  (Fuller Decl. ¶ 5, Attach. 4; Navarro Decl. ¶ 9; Pet. ¶ 24.)  The day after Immigration Judge Nickerson's Order, Petitioner filed a Notice of Appeal with the Board of Immigration Appeals, in which he seeks to challenge the decision that

---

[2]   The Notice also asserted that Petitioner was convicted of an offense that involved using a firearm or destructive device as defined by 18 U.S.C. § 921(a).  But an immigration judge later determined that ICE failed to prove Petitioner's removability under the firearm charge.  (Navarro Decl. ¶ 9.)

4

he is removable. (Pet. ¶ 25; Navarro Decl. ¶ 9.) That appeal is currently pending.³ (Navarro Decl. ¶ 9.) Petitioner commenced this matter by filing the Petition on March 27, 2013. (Doc. No. 1, Pet.)

**II.     Summary of the Parties' Positions**

Petitioner challenges his detention by ICE, and in the Petition he asks the Court to grant the following relief:

1. Require ICE to make an individualized custody determination and allow him to seek review of any unfavorable individualized custody determination by an immigration judge; and

2. Find that the practice of ICE's office in Bloomington, Minnesota, of detaining non-citizens under 8 U.S.C. § 1226(c), who are not taken into custody by the Attorney General at the time they are released from state custody, violates the clear statutory language of § 1226(c) and the Constitution of the United States.

(Pet., Relief Sought ¶¶ 1–5.) Petitioner asserts that ICE has held him in detention since February 14, 2013, in violation of 8 U.S.C. § 1226(c), which provides for mandatory pre-deportation detention of certain aliens, including

---

³    To the extent that Petitioner believes that the Immigration Judge incorrectly concluded that Petitioner is a removable alien, a habeas petition filed in district court is not the proper vehicle to raise such a challenge. His appeal to the BIA, however, is the proper forum to challenge the Immigration Judge's conclusion that his drive-by-shooting conviction is an aggravated felony, and he has the opportunity to file a petition for review of any constitutional claims or questions of law with the appropriate court of appeals. 8 U.S.C. § 1252(a)(2)(D).

5

those who have been convicted of aggravated felonies. Because § 1226(c) provides that the Attorney General shall take an alien convicted of an aggravated felony into custody "when the alien is released," Petitioner contends that ICE could only detain him under this provision if ICE had taken him into custody immediately after he was released from jail in December 2004. Because ICE waited more than eight years after his release to apprehend Petitioner in February 2013, he asserts that the Attorney General failed to detain him "when [he was] released," and he is therefore not subject to § 1226(c)'s mandatory pre-removal detention. Instead, he contends, he is entitled to an individual determination whether he "may be released on bond or paroled." *See Zadvydas v. Davis*, 533 U.S. 678, 683 (2001) ("While removal proceedings are in progress, most aliens may be released on bond or paroled.") (citing 8 U.S.C. § 1226(a)(2)).

Respondents argue that 8 U.S.C. § 1226(c) does not require the Attorney General to take an alien convicted of an aggravated felony into custody immediately upon release from prison for the law's mandatory, non-reviewable detention provisions to be triggered. Respondents contend that in *Matter of Rojas*, 23 I. & N. Dec. 117 (BIA 2001), the Board of Immigration Appeals ("BIA") reasonably concluded that 8 U.S.C. § 1226(c) includes no such immediacy requirement. And Respondents assert that under *Chevron, USA v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the Court is obligated to defer to that interpretation because it is reasonable.

6

## DISCUSSION

I.  **Legal Standard**

"[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a). However, "[t]he writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

II. **Analysis**

  A. **Whether Petitioner is in Custody in Violation of the Laws of the United States**

Petitioner's primary contention is that he is in custody in violation of the laws of the United States. Specifically, he asserts that his detention under 8 U.S.C. § 1226(c) is unlawful because he has been denied the opportunity for an individualized bond hearing and is wrongfully being held pursuant to the mandatory, pre-removal detention provision. Thus, the Petition raises an issue concerning the proper construction of 8 U.S.C. § 1226. In particular, § 1226(c) provides that –

> The Attorney General shall take into custody any alien who is . . . deportable by reason of having committed any offense covered in section 1227[(A)(iii) (covering aggravated felonies)] . . . *when the alien is released*, without regard to whether the alien is released on

> parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1)(B) (emphasis added). An alien detained under this provision is not eligible for bond or parole, except in limited circumstances that do not apply here. *See* 8 U.S.C. § 1226(c)(2) (providing that the "Attorney General may release an alien [convicted of an aggravated felony] only if the Attorney General decides" that the alien's release is required for witness protection and poses no danger to the safety of others). Thus, the issue of statutory construction in this case is whether the Attorney General's failure to take Petitioner into custody immediately after he was released from physical custody on December 9, 2004, means that Petitioner is now eligible for an individualized bond or parole review.

This issue has already been addressed by the BIA, to which the Attorney General, who is tasked with administering the nation's immigration laws, has delegated the authority to interpret and administer the Immigration and Nationality Act. *See* 8 U.S.C. § 1103(a)(1) (giving the Attorney General authority to administer immigration laws); 8 C.F.R. § 1003.1(d)(1) (delegating the Attorney General's authority to the BIA). In *Matter of Rojas*, 23 I. & N. Dec. 117 (BIA 2001), the BIA construed the statute contrary to Petitioner's position. In that case, the BIA considered an alien's appeal of an immigration judge's decision that he was subject to mandatory detention under the § 1226(c) because he had been convicted of an aggravated felony even though he was not taken into

custody by the Attorney General until two days after his release from prison. *Id.* at 118. After considering the ordinary meaning of the words in the statute, the overall statutory context, the previously enacted versions of the current provision, and the practical considerations affecting the statutory analysis, the BIA concluded that an alien convicted of an aggravated felony is subject to mandatory detention under § 1226(c) "despite the fact that he was not taken into Service custody immediately upon his release from state custody." *Id.* at 127. ICE apparently relied on the BIA's construction of § 1226(c) in concluding that Petitioner is subject to mandatory detention under the Immigration and Nationality Act. (*See* Navarro Decl. ¶ 8.)

Based on the foregoing, the Petition implicates "'an agency's construction of the statute which it administers,'" requiring this Court to consider "the principles of deference described in *Chevron*[.]"[4] *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) (quoting *Chevron*, 467 U.S. at 842); *see also Hosh v.*

---

[4] In *Godinez-Arroyo v. Mukasey*, 540 F.3d 848, 850 (8th Cir. 2008), although the Eighth Circuit declined to resolve the question whether an unpublished BIA decision is entitled to *Chevron* deference, the clear implication of the opinion is that *Chevron* deference is proper for the BIA's published decisions, such as *Matter of Rojas*, because they are intended to carry the force of law. *See id.* (noting that the court defers to agency action that carries the force of law and citing *Aguirre-Aguirre*, 526 U.S. at 425, for the proposition that "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication."). Both the Supreme Court and the Eighth Circuit have concluded that the BIA's interpretations of gaps in the INA are entitled to *Chevron* deference. *Aguirre-Aguirre*, 526 U.S. at 425; *Amador-Palmoares v. Ashcroft*, 382 F.3d 864, 867 (8th Cir. 2004) ("[W]e review the Board's construction of the INA under the deferential standard described in [*Chevron*.]").

9

*Lucero*, 680 F.3d 375, 378–81 (4th Cir. 2012) (applying *Chevron* deference to the BIA's interpretation in *Matter of Rojas* of 8 U.S.C. § 1226(c)). Under these principles, this Court must first ask "whether Congress has directly spoken to the precise question at issue" and, "if the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If, however, "the statute is silent or ambiguous with respect to the specific issue before it . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Aguirre-Aguirre*, 526 U.S. at 424 (quoting *Chevron*, 467 U.S. at 843). Considering this second prong of the *Chevron* analysis, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached . . . ." *Chevron*, 467 U.S. at 843 n.11.

        **1.**     *Chevron* **step one**

Applying the first prong of the *Chevron* test, this Court concludes that Congress has not directly spoken to the precise issue presented here. A statute's language is ambiguous if it is susceptible to more than one reasonable interpretation. *See, e.g.*, *In re Lyon County Landfill, Lynd, Minn.*, 406 F.3d 981, 984–85 (8th Cir. 2005) (concluding, at step one of the *Chevron* analysis, that a statute is ambiguous because it was susceptible to more than one "plausible" interpretation). In *Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012), the Fourth

Circuit persuasively explained the ambiguity created by the phrase "when the alien is released" in § 1226(c) as follows:

> The meaning of § 1226(c) is not plain to us. To be sure, "when" in § 1226(c) can be read, on one hand, to refer to "action or activity occurring 'at the time that' or 'as soon as' other action has ceased or begun." . . . On the other hand, "when" can also be read to mean the temporally broader "at or during the time that," "while," or "at any or every time that . . . ." We must therefore consider the BIA's interpretation.

*Id.* at 379–80. Several district court decisions that address the meaning of "when the alien is released" in § 1226(c) have reached different conclusions about whether the phrase is ambiguous. *Id.* at 379 & nn. 2–3 (citing several cases concluding that the statute is ambiguous and deferring to the BIA's interpretation and several others concluding that the plain meaning of the statute is as Petitioner contends here). Some of the courts that have found the phrase "when the alien is released" to plainly require the Attorney General to act without delay have focused on dictionary definitions of the word "when." *See Khodr v. Adducci*, 697 F. Supp. 2d 774, 778–79 (E.D. Mich. 2010) (discussing other district court decisions citing dictionary definitions of "when"); *Waffi v. Loiselle*, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007) (citing dictionary definitions of "when" and concluding that the primary usage of the term "includes the characteristic of 'immediacy'"). But as the court noted in *Hosh*, although "when" can be used to mean "as soon as," the ordinary meaning of "when" is elastic enough to embody concepts other than immediacy.

As the Eighth Circuit has described, "'[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Lovilla Coal Co. v. Harvey*, 109 F.3d 445, 449 (8th Cir. 1997) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). The context of § 1226(c) and the statute as a whole supports a conclusion that immediate action by the Attorney General is not required to trigger the mandatory-detention provision.[5] First, this Court addresses how the phrase "when the alien is released" is used in the context of § 1226(c)(1). In addition to requiring the Attorney General to take into custody any alien who, like Petitioner, is considered removable because he has committed an aggravated felony, § 1226(c)(1) also requires the Attorney General to take custody of aliens seeking to be admitted to the United States who have committed multiple crimes, crimes of moral turpitude, drug crimes,

---

[5] The following discussion of statutory context as part of the first step of the *Chevron* analysis overlaps conceptually with the inquiry whether the BIA's construction of § 1226(c) is permissible. This occurs because the two steps of the *Chevron* doctrine can arguably be merged into a single inquiry. If at step one a court concludes that Congress has unambiguously required or prohibited the construction an agency gives a statute, then the agency's interpretation is, of course, not a permissible one. And, if at step two, a court concludes that the agency's construction of a statute falls outside the range of permissible interpretations of the language, the Congress has arguably spoken to the precise issue before the court because it has prohibited the agency's interpretation. Thus, it can be said that "*Chevron* calls for a single inquiry into the reasonableness of the agency's statutory interpretation." Matthew C. Stephenson & Adrian Vermeule, Chevron *Has Only One Step*, 95 Va. L. Rev. 597, 598 (2009). As it must, this Court retains the two-step framework of *Chevron*, but acknowledges that the framework can create confusion.

prostitution crimes, controlled substance crimes, or engaged in other serious criminal activity. 8 U.S.C. § 1226(c)(1)(A) (cross referencing 8 U.S.C. § 1182(a)(2), which lists certain acts that make an alien inadmissible). Further, subsections (c)(1)(C) and (c)(1)(D) require the Attorney General to take into custody aliens who are inadmissible or deportable for having engaged in serious criminal conduct or terrorist activity. *Id.* § 1226(c)(1)(C) (cross referencing 8 U.S.C. § 1227(a)(2)(A)(i), which lists crimes of moral turpitude); § 1226(c)(1)(D) (cross referencing 8 U.S.C. §§ 1182(a)(3)(B) and 1227(a)(4)(B), which apply to terrorist activities). Congress's intent in grouping these kinds of aliens together, and ultimately subjecting them to mandatory detention "when . . . released," could reasonably derive from the seriousness of the conduct they have engaged in, or, perhaps less reasonably, on the timing of their apprehension by the Attorney General.

The other provisions of § 1226 reflect a focus on the type of conduct criminal aliens have engaged in. Subsection (a) removes aliens like Petitioner who are convicted of aggravated felonies from the ordinary framework that provides bond and parole hearings pending removal decisions. *Id.* § 1226(a) (providing that the Attorney General's discretionary bond and parole decisions apply to detained aliens "[e]xcept as provided in subsection(c)). But nothing in that provision suggests that Congress made that choice based on when such an alien is taken into custody. In addition, under § 1226(c)(2), the Attorney General "may release an alien described in paragraph [(c)]1" only if the Attorney General

13

determines that release is necessary to provide witness protection, or for similar reasons. The reference to "an alien described in paragraph (1)" plausibly refers to aliens convicted of aggravated felonies and the other types of aliens listed in § 1226(c)(1)(A)–(D), without any obvious reference to when those aliens were taken into custody. Thus, the context of §1226 as a whole does not reflect unambiguous congressional intent that the mandatory, pre-removal detention provision only applies to the categories of criminal aliens that are immediately brought into the custody of the immigration authorities.

For the foregoing reasons, Court concludes that the statute does not plainly answer the precise issue presented, and this Court must proceed to the second step of the *Chevron* analysis.

### 2. *Chevron* step two

Applying the second step of the *Chevron* analysis, this Court concludes that the BIA's interpretation of the statute is a reasonable one to which the Court must defer. In *Hosh*, the Fourth Circuit inquired at step two of the *Chevron* analysis, whether the BIA reasonably construed § 1226(c) to require mandatory, pre-removal detention of criminal aliens even if they were not detained immediately after release from state custody. *See id.* at 380 (discussing step two of the *Chevron* analysis). In reaching the same conclusion as this Court, the Fourth Circuit explained its position as follows:

> If we accept that "when . . . released" means "at the moment of release," then we must conclude that Congress intended to take an aggressive stance against criminal aliens, *i.e.*, Congress wanted

14

> federal authorities to detain criminal aliens *immediately* upon their release from other custody. We cannot however, take another step and find that, if the criminal alien was not immediately detained after release due to an administrative oversight or any other reason, then Congress's clear intent was to have the criminal alien no longer be subject to the mandatory detention of § 1226(c). With this in mind, we conclude that it is far from plain, and indeed unlikely, that "when . . . released" means "at the moment of release, *and not later*." While that conclusion is possible, we think it is strained.

*Id.* The Fourth Circuit further explained why it is unlikely that Congress intended to exempt criminal aliens who are not immediately detained from the mandatory detention provision:

> We cannot deem it clear that Congress would, on one hand, be so concerned with criminal aliens committing further crimes, or failing to appear for their removal proceedings, or both, that Congress would draft and pass the mandatory detention provision, but on the other hand, decide that if, for whatever reason, federal authorities did not detain the alien immediately upon release, then mandatory detention no longer applies.

*Id.* at 380–81 n.6.

In other words, the policy reflected throughout § 1226 is that certain criminal aliens have engaged in conduct that takes them outside the ordinary detention framework where they would otherwise be eligible for bond or parole hearings during removal proceedings. Subjecting this category of aliens to mandatory, pre-removal detention is reasonably related to the fact that they have engaged in criminal or terroristic acts. Conditioning mandatory detention on the timing of the Attorney General's apprehension of such aliens, on the other hand, has a much less obvious relationship to the public safety and effective deportation policies that prompted the statute's passage. *See Hosh*, 680 F.3d at

15

381 (discussing *Denmore v. Kim*, 538 U.S. 510, 518–19 (2003), and explaining that the statute was designed to detain criminal aliens pending deportation to prevent them from committing further crimes and to ensure that they appear for removal hearings). Therefore, like the court in *Hosh*, this Court concludes that although

> Congress's command to the Attorney General to detain criminal aliens 'when . . . released' . . . connotes some degree of immediacy, we cannot conclude that Congress clearly intended to exempt a criminal alien from mandatory detention and make him eligible for release on bond if the alien is not *immediately* taken into federal custody.

*Id.*

Petitioner argues that the reasoning of the BIA in *Rojas* and of the Fourth Circuit in *Hosh* ignores the canon of statutory construction courts employ to avoid reading statutes in a way that creates doubts as to their constitutionality. (Doc. No. 11, Pet'r's Reply tp Resp. to Pet. for Writ of Habeas Corpous ("Pet'r's Reply") 12-13.) Petitioner appears to direct this argument at deciphering the plain meaning of § 1226(c), but "[t]he so-called canon of constitutional avoidance is an interpretive tool, counseling that *ambiguous statutory language* be construed to avoid serious constitutional doubts." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (emphasis added). Properly understood, this argument suggests that the Court should treat the BIA's interpretation of the ambiguous language of § 1226(c) as impermissible to avoid constitutional doubts. The Supreme Court has indeed concluded that an agency's interpretation of an

ambiguous statute will not receive *Chevron* deference when the interpretation raises constitutional questions. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference.").

Petitioner acknowledges that in *Denmore v. Kim*, 538 U.S. 510, 524–29 (2003), the Supreme Court concluded that mandatory detention prior to the entry of a final order of removal under § 1226(c) does not violate the Constitution. However, since *Demore*, several federal courts have concluded that prolonged detention of aliens under § 1226(c) does raise constitutional concerns. *See Diop v. ICE/Homeland Security*, 656 F.3d 221 3d Cir. 2011); *Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir. 2005); *Ly v. Hansen*, 351 F.2d 263, 267–68 (6th Cir. 2003). As these cases recognize, it is not *the fact of* mandatory, pre-removal detention that leads to a constitutional concern, but *the length of* that detention that can create constitutional doubt. *See Hernandez v. Sabol*, 823 F. Supp. 2d 266, 271–73 (M.D. Pa. 2011) (discussing federal cases concerned with the constitutional issues presented with lengthy detention of aliens under § 1226(c) while removal proceedings are pending). Because the BIA's interpretation – that § 1226(c) applies to criminal aliens like Petitioner who are detained sometime after their release from state custody – does not automatically permit prolonged detention,

it does not raise serious constitutional concerns that would require the Court to decline extending administrative deference in this case.[6]

Ultimately, Petitioner's argument in this case has the ring of a policy debate that his side has already lost.  On Petitioner's side, one could see the appeal of having immigration authorities determine, on an individual basis, whether a person in Petitioner's shoes should be detained.  Given Petitioner's significant family ties within the United States, his years of work history, and his apparent ability to stay out of trouble for almost a decade after his release from state custody, an individualized bond or parole review might provide him the opportunity to convince an immigration judge that he should be allowed to return to his job, contribute to society, and care for his daughter while he awaits a final deportation decision.  And automatically detaining him without such a review guarantees that public funds will be used to keep him locked up until the immigration authorities decide whether to deport him.  Reasonable minds can disagree about the appeal of Petitioner's side of this policy debate.  But the other

---

[6]  Here, just as in *Hernandez v. Sabol*, the record does not suggest that Petitioner's detention has been unnecessarily prolonged, that ICE has intentionally delayed any of the removal proceedings against him, or that there is going to be some impediment to the conclusion of his removal proceedings.  *See* 832 F. Supp. 2d at 273 (discussing absence of constitutional concerns over the length of the petitioner's detention pending removal proceedings where factors did not implicate issues highlighted in *Denmore*).  And as in *Hernandez*, "[t]his is not to say . . . that at some time in the future [Petitioner] is in any way prevented from pursuing relief in that any challenge with respect to his continued detention without inquiry into its necessity becomes more suspect as his detention continues." *Id.*

side has won: Congress has made the judgment, expressed in § 1226(c), that the safety risk posed by aliens who, like Petitioner, have committed certain crimes is too great and the need to have them available for removal too important to warrant a system other than mandatory, non-reviewable detention. And the BIA has reasonably interpreted the applicable statute to embody that judgment without regard to when the immigration authorities are able to first take federal custody of such an alien. The federal courts have no authority to open up that debate again and choose a different winner.

### B. Constitutional Issues

The Petition also briefly suggests that Petitioner's custody deprives him of his constitutional rights under the Fifth and Fourteenth Amendments. (Pet. ¶¶ 34–35 and Prayer for Relief ¶ 4.) The Petition, however, fails to elaborate on these claims. And Petitioner has not addressed any constitutional issues in his Reply Memorandum except to suggest that Petitioner's continued detention pending removal proceedings raises serious constitutional concerns under *Zadvydas v. Davis*, 533 U.S. 678 (2001), which this Court should apply in construing the plain meaning of § 1226(c). This Court has addressed Petitioner's canon-of-constitutional-avoidance argument above, and does not construe such arguments or the Petition to make out a claim that Petitioner is being detained in violation of the Constitution of the United States. Thus, to the extent Petitioner raised a separate Fifth or Fourteenth Amendment claim, that claim has been abandoned and the entirety of the Petition should be denied.

19

## C. Conclusion

In conclusion, the Petition fails to demonstrate that Petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2241(c)(3). Accordingly, the Petition must be denied, and this action dismissed.

## RECOMMENDATION

Based on the above, and on all the files, records, and submissions herein,

**IT IS HEREBY RECOMMENDED** that:

1. The Petition for Writ of Habeas Corpus (Doc. No. 1), be **DENIED**; and

2. This case be **DISMISSED WITH PREJUDICE**.

Dated: April 22, 2013

                                          *s/ Jeffrey J. Keyes*
                                          JEFFREY J. KEYES
                                          United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **May 6, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.